JANE HOLT *v.* JAMES P. MILLER, ET AL.

**Fraud in Compromise of Claim.**

Where in an action to set aside a compromise and secure the return of money paid on account thereof, it is shown that a person was induced to enter into such a compromise agreement and pay money thereon by reason of fraudulent representations and threats, she is entitled to recover such money and have such agreement set aside.

APPEAL FROM RUSSELL CIRCUIT COURT.

January 4, 1877.

OPINION BY JUDGE PRYOR:

After the institution of the original action for the recovery of the $2,400, an amended petition was filed by the appellant, in which she sought to avoid the effect of an alleged compromise, by which the claim for the money seems to have been adjusted. It is alleged in

this pleading that the compromise was obtained through the fraud and misrepresentations of the parties in interest, and by threats upon their part to prosecute the appellant for a felony in the event she persisted in prosecuting the claim.

The case was then transferred to a court of equity, and was really an equitable action, as the compromise, if valid, precluded the appellant from recovery. The original petition also alleged that the $2,400 had been extorted from the appellant by fraud and mis-representation. The appellees pleaded to the original and amended petition, denying all fraud, and upon this issue, which was cognizable in a court of equity, the chancellor undertook to determine the controversy. He adjudged that the appellant was not entitled to the money, and that the compromise was filed and pleaded as a bar only to appellant's recovery, indirectly disposing of the equitable issues, but at the same time refusing to grant the appellant any relief. With this view of the judgment, if it should hereafter be adjudged that the compromise was fraudulently obtained, the appellant will be without remedy, as it is determined that she has manifested no right to the money. Such a meaning, however, should not be given the judgment below, and the effect of the decision is that the compromise is binding on the parties and must be enforced, else it could not be successfully pleaded in bar of the action. If not a bar, the appellant was entitled to judgment.

This case was properly in equity by reason of the fraud alleged in both the original and amended pleadings, and having been disposed of by the chancellor we shall treat the case as an action in equity. If there were no fraud in obtaining this money, and if its surrender were voluntarily by appellant, she is without remedy. The uncontradicted testimony in the case shows that the appellant had been the mistress of the intestate, Berryman Flowers, for nearly fourteen years; that she had by him six children, all of whom he recognized as his own, and as such undertook to maintain and support them. There was no attempt upon his part or that of appellant to conceal the intimate and improper relations that existed between them, and it may be that she consented to gratify his passions under the belief that he would at some future day make her his wife notwithstanding the opposition of his children, but whether so or not it was incumbent upon him to protect and maintain his own offspring, and it. was not unreasonable that he should undertake to discharge this natural duty, not only by providing for them whilst he lived, but leaving

ample means for their support as well as that of the mother after his death.

The gift of the money is established by the appellant and her daughter, and their statements, corroborated by those who have no interest whatever in this controversy. She had it in her possession, and the proof conduces strongly to show she had been surrendered the custody of it for some months prior to his death. It is certain that he had kept this money for a long time for some special purpose. The bills, or some of them, are identified by Holt, his son-in-law, as having been in the possession of the decedent since 1865, and the balance of the money for several years. He was an active business man, accustomed to loaning money and buying notes, but these particular bills, in large sums of fifty dollars, and one of five hundred dollars, he kept in a certain pocket book and seems never to have been willing to part with it. It is true that Holt says he at one time proffered to loan it to him, but several witnesses speak of applying to him for money, others to sell notes, and while willing to loan or to buy, was never willing to use this money, or seemed not to have done so, but was compelled or preferred to resort to other means that rendered it difficult for him to raise money to comply with his business transactions. If this money in controversy was his, or was not set apart for the woman he regarded as his wife and her children as his, there can be assigned no reason why he could not have used it as readily as any other means within his reach.

This money was in the house of appellant when the intestate, Flowers, died. He was asked by parties present if he did not wish to make some arrangement in regard to his property and he declined to take any action. He knew that appellant then had this money, and if he intended it for his legitimate children he would have communicated to his sons-in-law, who were present, the fact that this large sum of money was in the house and in the custody of appellant. He said to C. L. Rice not long before his death that if he died or was accidentally killed that he had left money enough with appellant to make her safe, and to the witness Nelson that he would give his children five hundred dollars each. He was then talking of the children by appellant. Other facts and circumstances might be alluded to, indicating not only an intention, but establishing the fact that this money had been given appellant, and whilst she may have said during the time that the man she recognized as her husband was a corpse in her house, that he had made no provision for her and the children, she doubtless alluded to the fact that he had made no will,

as there is no pretense that she was refusing to assert any claim to this money, but on the contrary she persisted in asserting her claim until by the importunities and threats of Miller and others she was induced to surrender it. The haste to make her surrender the money and the constant demands upon her to deliver it over, throws much suspicion over the conduct of the parties defendants. Before the intestate was buried these importunities began and the money in fact delivered up.

Miller was sent for to make the demand. She was informed by him that to retain it would be a penitentiary offense. He was sheriff or deputy sheriff of the county, a man of influence and in whom she had much confidence. It was natural that she should listen to his suggestions. The other defendants were present and had sent for Miller to accomplish what might, if they undertook it, prove a failure on their part. Others had been talked to by the parties in interest and asked to impress on the mind of appellant the fact that if she refused to give up the money she could be indicted for a felony.

It is true that Miller denies that any such threat was made by him or any improper influence exercised over appellant, but in his own deposition he admits that he told her if the notes were assigned to her that it would be forgery, and upon her asking him what forgery was, she was told that the end of it would be the penitentiary. He also told her that the parties could get out a search warrant and search the house for anything they wanted. It seems that one Campbell had advised her to have the notes assigned to her, and from the nature of his testimony and his anxiety to ascertain what notes and money the appellant had possession of, it is not unfair to infer that his mission to the house was at the instance of the parties in interest.

The niece of Miller says that Miller, on his return home, stated to his wife that he had told the appellant that it would be a penitentiary offense for her to keep the money and that he would dislike to take as handsome a woman as she was to jail. There is no reason to discredit this witness and the appellant in her statement of the occurrences that took place on the day of the intestate's death and when the money was given up. It is sustained in every particular by parties having no interest in the result of this litigation, and no fact has been more certainly established in this case than that the defendants, by intimidation, threats and promises obtained the money in controversy from appellant. The compromise was obtained in the same way. The appellant was summoned before the grand jury, and was

told that she would be attached if she failed to appear. She did appear, and the foreman seems to have been in entire ignorance of the purpose for which she was summoned, but Fields, the father of the young man who served the subpœna, made inquiry of her as to the person inducing her to institute the present action. He then asked her if the suit was withdrawn, to which she gave a negative response and was then told she could leave. The foreman, Selby, says that he was struck with the singularity of the proceeding, and recollects that Fields asked the question who induced her to bring the uncalled for law-suit. As soon as she left the room and before she left the court-house, her lawyer was sent for and she concluded it was best to compromise, and the moment she was through with the lawyer she was approached by Rosseau, a son-in-law of the intestate, with a view to making a settlement of the differences between them.

Her lawyer, it is true, knew of the compromise, and perhaps advised it and drafted the paper; but he was doubtless unaware of the influences operating upon the mind of his client at the time and the means resorted to for the purpose of having this suit dismissed. That she was called before the grand jury to testify in regard to some other suit is hardly reasonable, and why the grand jury undertook to investigate the right of parties to enforce their claims in a court of justice is not satisfactorily explained, and, in the language of the foreman, "I thought the question to the appellant rather a strange one from the language used." The history of this proceeding before the grand jury, as given by the appellant, is fully sustained by Selby, the foreman, and we might add that every prominent feature of this case, about which appellant has been called to speak her statements in regard to the matter involved, has been corroborated by others who are in no manner identified with the parties in interest. The compromise has never yet been signed by Miller and was not signed by one other party in interest at the time, but if signed would not change the result. This action is not against Miller as administrator, but against the defendants for wrongfully obtaining the possession of the money in controversy.

The original petition and amendment constituted but one action, and so far as these appellees are concerned they should be required to refund the money. That Miller was acting for other parties is no defense to the action. He will not be allowed to justify his own wrong in this way. The judgment below is *reversed* and cause remanded with directions to render a judgment against the defendants in the original action for the sum of $2,400 with interest from the

time it was paid over to them. If Miller has any claims against the appellant in his capacity as administrator he can assert them. The alleged compromise is no obstacle to a recovery. The cause is remanded for further proceedings consistent with this opinion.

*Russell & Arritt, Sallee & Sallee, for appellant.*

*William S. Stone, Jos. E. Hayes, for appellees.*